1 LAW OFFICE OF STANLEY R. APPS
2 Stanley R. Apps (State Bar No. 309425)
3707 Poinciana Drive, No. 81
3 Santa Clara, CA 95051
(310) 709-3966
4 stan@appsatlaw.com

5 Attorney for Plaintiff Trupti Mohite

6

7

8

9 **UNITED STATES DISTRICT COURT**

10 **NORTHERN DISTRICT OF CALIFORNIA**

11

| | |
|---|---|
| 12 TRUPTI MOHITE, ) | Case No.: |
| 13            Plaintiff, ) | COMPLAINT FOR: |
|       vs. ) | 1) Discrimination on the basis of sex, in violation of 20 U.S.C. § 1681 |
| 14 ) | |
| CORNELL UNIVERSITY, doing business as ) | 2) Retaliation for a complaint of sex discrimination, in violation of 20 U.S.C. § 1681 |
| 15 CORNELL EXECUTIVE MBA AMERICAS ) | |
| 16 PROGRAM, ) | |
| 17            Defendant. ) | JURY TRIAL DEMANDED |
| 18 ) | |
| 19 ) | |
| 20 _____ ) | INJUNCTIVE RELIEF SOUGHT |

21

22 **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

23        The Plaintiff, TRUPTI MOHITE (hereinafter "Mohite" or "Plaintiff") hereby sues

24 Defendant Cornell University, doing business in this judicial district as Cornell Executive MBA

25 Americas Program, for discrimination on the basis of sex and retaliation for a complaint of sex

26 discrimination, in violation of Title IX of the Education Amendments Act of 1972, codified as

27 amended at 20 U.S.C. § 1681 *et seq.*, and further states as follows:

**PARTIES**

28

1. Plaintiff Trupti Mohite is a natural person residing in this judicial district, who at all times relevant to this complaint has been a student attending the Cornell Executive MBA Americas Program at the San Jose location of that program.

2. The Cornell Executive MBA Americas Program is an educational program jointly operated by Defendant Cornell University and Queen's University, Canada.

3. Cornell University is an institution of higher education located in Ithaca, New York. Cornell University maintains a continuous presence in this judicial district through its role operating, administrating and controlling the Cornell Executive MBA Americas Program.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over Plaintiff's claims, and is the proper venue, because these claims are brought under federal law and Defendant maintains a continuous presence in this judicial district by doing business in this judicial district as the Cornell Executive MBA Americas Program.

## FACTS

5. Plaintiff enrolled in the Cornell Executive MBA Americas Program in July 2019 and was placed on a team (hereinafter referred to as "Team San Jose") with six other, all male, students, including: Soumyorup Chakraborty (hereinafter referred to as "Chakraborty"); Mahesh Jeswani (hereinafter referred to as "Jeswani"); David Gaber (hereinafter referred to as "Gaber"); John Richardson (hereinafter referred to as "Richardson"); Usman Naeem (hereinafter referred to as "Naeem"); and Nicholas Ramirez (hereinafter referred to as "Ramirez").

6. From July through September 2019, all of Mohite's teammates, with the exception of Ramirez, subjected Mohite to ongoing and pervasive mistreatment based on her sex. These behaviors began on July 9, 2019, during the program's conference in Kingston, Canada, and continued until early September 2019. The incidents referred to in this complaint occurred in several places: at the Kingston conference, during the team's weekly meetings at Cornell's San Jose Campus, and on the online group conversations via WhatsApp and Google Hangout through which the team regularly communicated.

7. The team's behaviors undermined Mohite's ability to participate effectively on her team, and eventually resulted in both emotional distress and the reactivation of a pre-existing

medical condition. The team members engaged in the following behaviors, which will be outlined in greater detail later in this complaint:

    a.  Excluding Mohite from participating equally in course-related discussions, activities, and work assignments, then blaming Mohite for said lack of participation;

    b.  Using demeaning and insulting language toward Mohite;

    c.  Insinuating that Mohite's form of participation in group meetings evidenced her inferior intelligence;

    d.  Subjecting Mohite repeatedly to embarrassing references about her status as a single woman; and

    e.  Subjecting Mohite to jokes of a sexual nature.

8. Taken individually, each incident does not comprise discrimination; however, the pervasive and persistent nature of these incidents resulted in harm to the plaintiff. This harm was further exacerbated by the program's response to Mohite's complaint, including disparate treatment, deliberate indifference, and retaliation. The program administrators responsible for this response include Coach Amy Kohut (hereinafter referred to as "Kohut" or "Coach Kohut"); Coach Janet Gilfillan (hereinafter referred to as "Gilfillan" or "Coach Gilfillan"); and Program Director Verne Thalheimer (hereinafter referred to as "Thalheimer" or "Director Thalheimer").

9. On September 15, 2019, in response to Mohite's ongoing complaints about her teammates' behavior, Director Thalheimer provided Mohite with resources to file a formal complaint with Cornell University's Title IX office. Aside from providing this information, the program administration never addressed Mohite's ongoing complaints about her teammates' behavior.

10. However, seemingly in response to Mohite's ongoing complaints about sex discrimination, Coach Kohut called an Inter-Team Feedback Meeting. This meeting, attended by Coach Kohut and all students on Team San Jose, took place during two sessions: an in-person meeting on September 28, 2019, and a Zoom meeting on October 1, 2019. During these meetings, five of Mohite's teammates presented themselves as a united front, making false and unsubstantiated accusations about Mohite's inadequate performance on the team. Though Coach Kohut both accepted and acted on the allegations made by these five members of Team San Jose, she simultaneously ignored Mohite's allegations about gender bias on the team. Moreover, during these meetings, Coach Kohut silenced Mohite when she asked her teammates to provide specific details and evidence to support their allegations.

11. Following these two sessions comprising the Inter-Team Feedback Meeting, Coach Kohut gave Coach Gilfillan her notes from the sessions. In these notes, Kohut accepted the five teammates' allegations that held Mohite solely responsible for her team's dysfunction. In turn, Coach Gilfillan ordered Trupti to undergo a six-week process known as Performance Expectations (PE). Mohite was informed that during this process, her teammates would gather evidence about her behavior, which would then be used to judge her suitability for continuing in the program.

12. Mohite refused to undergo the PE process for fear that she would be evaluated by teammates who already had presented false statements about her, statements that the program administrators had accepted at face value. When Mohite refused to undergo PE, Director Thalheimer placed Mohite on a "team of one" and banned her from attending video lectures alongside her teammates. This action required Mohite to scramble to find a facility from which to attend the semester's remaining lectures. Director Thalheimer subsequently informed Mohite that he was recommending her removal from the program because she had failed to be an "effective and supportive" teammate.

13. Before imposing this consequence, Thalheimer allowed Mohite to challenge his decision at a hearing before the Executive MBA Americas Program's Joint Academic Committee (hereinafter referred to as the "JAC"). After this hearing, which took place on January 6, 2020, the JAC concurred that Mohite had failed to be an "effective and supportive" team member and demanded that she withdraw from the program.

14. Mohite began to experience gender bias on her team from the very beginning of the EMBA program. During the program's initial conference, which took place between July 9 and 12 July 12, 2019, in Kingston, Canada, three of Mohite's teammates—Chakraborty, Jeswani, and Gaber—began to exhibit the following inappropriate behavior towards her:

    a. In his capacity as Group Leader for Project 1, Chakraborty adopted language, behavior, and a tone that was markedly different from those he used to communicate with the other, all male, members of Team San Jose. At first, Chakraborty interrupted Mohite's efforts to contribute to team discussions; later, especially after Mohite objected to his disparate treatment of her, Chakraborty became increasingly dismissive, unresponsive, and demeaning towards Mohite;

    b. When Mohite tried to address Chakraborty's behavior during a team feedback meeting, Chakraborty claimed that Mohite was wasting the team's time and referred to her complaint as "ape-shit;"

- 4 -

c.  Following this team feedback meeting, Chakraborty assigned Mohite an unusually small workload (1 of 45 slides), thus preventing her from contributing to the group in a meaningful way, as required by the team contract. During the team meetings that followed, Chakraborty discarded Mohite's opinions, cut Mohite off when she tried to speak, and spoke to her with either a dismissive or competitive tone, in stark contrast to the respectful manner of communication he used with his male teammates;

d.  When during this same project Gaber asked Mohite to begin work on a slide that she knew had been assigned to another team member, Mohite questioned why she was being asked to work on it, as she did not want to interfere with another teammate's work. In response, Gaber responded, "Trupti, just do what you are asked to do." This exemplifies the intolerant response to questions that Trupti posed to her classmates, contributing to a dysfunctional team dynamic;

e.  When Mohite sought advice from her fellow teammates about how to address Chakraborty's behavior, Jeswani advised Mohite to remain quiet in group meetings and not to provide any opinions or feedback until one of the other members of the group requested that she contribute;

f.  Chakraborty's behavior became more blatantly dismissive of Mohite during the team's second project, led by Jeswani. At the beginning of Project 2, Jeswani emailed Chakraborty, Richardson, and Mohite, directing them to meet so they could work on one portion of the project. In response to Jeswani's email, Chakraborti responded to all members of this group chat but only addressed Richardson. In this email, Chakraborty stated that he would call Richardson by phone to establish a private meeting time during which they could work on the assignment. Chakraborty thus successfully excluded Mohite from participating in her sub-group and working on this portion of the project, which was required of all teammates;

g.  As team leader, Jeswani admitted to Mohite that Chakraborti's behavior was unacceptable and suggested that Mohite raise the issue at a post-project feedback meeting. When Mohite did as Jeswani asked, Chakraborty responded by saying, "I will not cooperate with Mohite even if the fucking Dean tells me to do so." In response, Jeswani declined to stand up for Mohite during the meeting. Even though another teammate, Gaber, had previously expressed his willingness to support Mohite in this matter, during the feedback meeting he remained silent on the issue, explaining that he had offered his feedback to Chakraborty in private. Though

Jeswani and Gaber had privately sympathized with Mohite, they failed to vocalize their opposition in a group setting, a tendency that recurred later in the semester.

15. During the program's initial conference in Kingston, both Gaber and Richardson made inappropriate comments or jokes in front of Mohite, which either called attention to her status as a single woman or referenced women in a demeaning manner, including the following:

   a.  During a lunch attended by some of Mohite's teammates, as well as members of other teams, the topic of Mohite's citizenship status came up.  In front of these students, Richardson stated that he was single and could marry Mohite. Even though Mohite rolled her eyes and expressed displeasure at the statement, Richardson continued the joke, asking, "Trupti, how many kids should we have?" Not knowing how to respond to these embarrassing overtures, Mohite simply said, "Awkward;"

   b.  During the residential session in Kingston, classes were structured with short breakout sessions, which took place in designated meeting rooms. At the end of one such breakout session, on July 11, 2019, Mohite, Gaber, and Jeswani were collecting their belongings. Gaber then said, in a low voice that was nonetheless loud enough for Mohite to hear, "My big finger got stuck in a tiny hole." The comment made Mohite feel embarrassed and uncomfortable; she gathered her belongings and quickly left the room.

16. Once the group returned to San Jose, Mohite became the Group Leader for Project 3. During this period, Gaber repeatedly sought to undermine Mohite's leadership. For example, out of the blue, Gaber texted the group on WhatsApp to insinuate that Mohite was no longer leading her own project. When Mohite requested an explanation for Gaber's unusual claim, Gaber refused to respond and subsequently organized a group meeting from which he excluded Mohite—in spite of the fact that, as Group Leader, Mohite had been the person to call for said group meeting.

17. During and after her tenure as Group Leader, Mohite continued to experience sex discrimination from Gaber and other team members. This occasionally took the form of their refusal to accept Mohite's input. Sometimes these teammates would interpret Mohite's contributions to the group as an effort to challenge their authority. Some teammates acted as though Mohite's tendency to ask incisive or exploratory questions indicated her failure to understand what the group was discussing.

18. When Mohite was leading Project 3, Gaber and Jeswani provided Mohite with incorrect data on a problem set, and were unable to provide her with the reasoning behind their data. When Mohite corrected the data, Jeswani refused to accept her corrections. As a result of Jeswani's continued refusal to assent to Mohite's corrections, alongside other forms of resistance from some team members, Mohite was forced to complete the group project on her own. Again, Mohite's ostensible difficulty in working with this team directly resulted from their disparate treatment of her.

19. During Project 5, led by Naeem, Mohite experienced a similar resistance to her contributions. On one occasion, Mohite pointed out that Naeem had calculated certain numbers incorrectly. She also offered suggestions for improving the project based on her understanding of relevant terms used in course lectures. Even though Mohite was polite and respectful during her exchanges with Naeem, Naeem later complained to the Coach Kohut that by making these corrections and suggestions, Mohite had proven herself to be an unproductive team member. Based on how Coach Kohut presented Naeem's story in her notes, Kohut seems to have assented to Naeem's characterization of the plaintiff.

20. While many of Mohite's teammates engaged in gender bias, one teammate in particular—David Gaber—made jokes of a sexual nature that caused Mohite to feel uncomfortable and eventually made it difficult for her to feel comfortable working with this group. A few examples follow:

  a. Gaber's first sexual "joke," referenced above, was his statement, "My big finger got stuck in a tiny hole;"

  b. Once they returned to San Jose, the team regularly gathered together to attend video lectures given by Cornell professors. When one such professor (Radhakrishna) was lecturing about the double-declining method, David commented, "Yeah…Double D," referring to the bra cup size for large breasts;

  c. On another class day, when team members were discussing their weekend plans, Mohite mentioned that she had a low-key weekend planned; in response, Gaber offered an uninvited comment on her status as a single woman: "Do you at least have cats to entertain yourself?"

21. As the Group Leader for Project 4, Richardson was inconsistent and unpredictable in his management style. When Mohite tried to gain clarity from Richardson about team meetings and deadlines, Richardson used demeaning and abusive language towards her.

22. As lead for Project 4, Richardson imposed a one-day deadline on the team, and subsequently failed to meet his own deadline. Hoping to avoid a repeat of this stressful incident, Mohite contacted Richardson on the group chat to ask for "more visibility into how meetings are scheduled for this BDM assignment so I can plan other things accordingly?"

23. After Richardson refused to offer concrete meeting days and times, Mohite continued to seek clarity from him over the group chat. Ultimately Richardson sent a series of aggressive and insulting messages to Mohite. First Richardson responded with the following confusing sentence: "I'm telling you someone will reach out to a meeting is needed if you cannot be there." When Mohite asked for clarification, Richardson responded with sarcasm: "If you do not understand, please refer back to my paragraph; thank you for the deductive reasoning and support." Subsequently, Richardson told Mohite that she was "about to get her ass cursed out" and referred to her query about meeting times as "bullshit" with which she was interrupting him during an important business meeting. Richardson sent these texts on the team's group chat, thus exacerbating the effect of such hostile language on Mohite by stating it in front of the entire team.

24. On other occasions, Richardson both lost his temper with Mohite and failed to meet team deadlines. All of the other team members were frustrated by the latter, though they chose not to voice this complaint during the Inter-Team Feedback Meeting—evidencing the male teammates' apparent decision to maintain a united front.

25. When Mohite texted Richardson that she was frustrated with having to do extra work on his behalf, Richardson responded with the following text: "OK then why did I waste my fucking time helping you edit or put it together you changed all that shit that was your own doing, sometimes you just need to shut the hell up and listen, or let shit go…stop with the mellow dramatic BS…We are a team. If someone is weak in and one area [sic] that is OK with pick up the slack [sic]" Later in the same message, Richardson blamed Mohite for reactivating her PTSD: "As a marine with PTSD, you are exasperating [exacerbating] my issues, with the anxiety that you are placing upon me."

26. This accusation is significant, since Richardson later complained to Coach Kohut that he was considering filing a restraining order against Mohite for reactivating his PTSD. As evidence for his accusation, Richardson referenced an email Mohite had sent to him in response to his text about being "a marine with PTSD." Richardson told Coach Kohut that Mohite's email cruelly made fun of his PTSD, and Kohut—without asking to see the email—repeated Richardson's accusation in her notes. This unsubstantiated allegation was

- 8 -

later cited by Coach Gilfillan when she accused Mohite of being an ineffective and unsupportive teammate. Mohite's actual email to Richardson, however, expressed sympathy for Richardson's condition. The email acknowledged that "working in the military could be one of the hardest and bravest jobs; offered to "listen and be supportive" if he needed to talk; and also stated that Mohite could no longer "be on the receiving end of anyone's blowouts." In this email, Mohite also told Richardson that she had not observed him "using derogatory language towards other team members" and that she expected the same respect with regard to herself.

27. When confronted with Richardson's accusation that Mohite somehow exacerbated his PTSD, Coach Kohut did not ask Richardson for evidence supporting his claim (for example, copies of the email exchange). Rather, Kohut appears to have accepted Richardson's accusation as the truth. Nonetheless, instead of informing Richardson that Mohite's alleged discrimination against him was beyond the purview of the program administrators, and a matter that he should address to the university's Title IX office (as Thalheimer had stated in response to Mohite's complaint), Coach Kohut presented Richardson's complaint to Gilfillan. In turn, Gilfillan cited Kohut's reference to the exchange when presenting evidence that Mohite had failed to be an effective and supportive teammate.

28. On several occasions between July and September 2019, some of Mohite's teammates agreed, and stated as much to Mohite, that individual members of the team treated Mohite differently than they treated the other, male, members of Team San Jose. Nonetheless, when these individual team members had an opportunity to articulate this viewpoint in a group setting, they declined to do so. One team member, Ramirez, who regularly commiserated with Mohite about the team's mistreatment of her, also remained relatively silent during the Inter-Team Feedback Meeting, though he did express discomfort about Gaber's sexual jokes. Possibly Ramirez feared that he would be singled out as an unsupportive teammate, as Mohite had been, if he raised concerns about other members of the team.

29. Once it had become clear to Mohite that the other team members were faulting Mohite for the team dynamic, she suggested to Coach Kohut that the team might have railroaded her in order to deflect responsibility for their individual and collective actions. Coach Gilfillan cited and then denied Mohite's speculation about railroading in the report she wrote to justify Mohite's removal from the program. In this report, Gilfillan concludes: "It was *abundantly clear*, based on the entirety of the [Inter-Team Feedback] meeting and the

subsequent conversations, that *no bias or collusion* on the part of the team to alienate or undermine Trupti was taking place" [emphasis added].

30. Unfortunately, the program administrators interpreted the apparent unity of Mohite's teammates, as well as their false claims about Mohite's performance on the team, as evidence that Mohite was solely to blame for the team's dysfunction.

31. Gilfillan recommended that Mohite be placed under the program's Performance Expectations process (hereafter "PE"), which is a process intended to address inadequate academic performance by team members. In Mohite's case, the decision to place her under PE was based largely (if not entirely) on the unsubstantiated (and in some cases blatantly false) allegations made by some of Mohite's teammates.

32. The first time Mohite sought advice from Coach Kohut about problems with her team was on August 13, 2019. Mohite emailed Coach Kohut on August 13 and then spoke with her on the phone two days later. In spite of Mohite's detailed email to Kohut about the gender bias and sexually-suggestive remarks, Kohut advised Mohite to try and understand her teammates' strengths and weaknesses using the DISC personality profile. Kohut also recommended that Mohite address the problem using emotional intelligence. Both suggestions seemed odd to Mohite, since these are not the usual methods for addressing the behavior about which she had complained.

33. Mohite again reached out to Coach Kohut on August 22, 2019, following Richardson's use of abusive language towards her in a group chat. Mohite asked Kohut if Cornell had a Code of Ethics that might be helpful in resolving the behavioral issues she was encountering. Along with this email, Mohite attached snapshots evidencing her teammates' inappropriate communications.  Kohut responded that she planned to speak individually with the other team members and would get in touch with Mohite afterward.

34. On September 4, 2019, Coach Kohut let the entire team know that she was calling an Inter-Team Feedback Meeting. Before that meeting took place, however, Mohite had become even more distressed as a result of increased hostility from her teammates. She was also disturbed after hearing from Ramirez that Gaber, Chakraborty, Jeswani and Naeem had been conferring in the parking lot after lectures, referring to Mohite's behavior in a negative manner. On September 11, in response to Mohite's complaints about escalating problems on the team, Kohut claimed that she would communicate these issues with Coach Gilfillan and Director Thalheimer.

35. As a result, on September 15, 2019, Mohite met with Kohut and Thalheimer over Zoom; during this meeting, Thalheimer suggested that Mohite file an investigation with Cornell University's Title IX office. Thalheimer stated that nothing could be done at the program level with regard to Mohite's specific complaints.

36. On September 28 and October 1, Coach Kohut conducted two meetings with the team, one in-person and one via Zoom. Ostensibly, these meetings took place in response to Mohite's repeated complaints about her teammates' behavior, since the program's literature specifies that such meetings occur when a member of the team complains that another member "repeatedly fails to uphold and respect [the team contract]."

37. During the two Inter-Team Feedback Meetings, Chakraborty, Jeswani, Gaber, Richardson, and Naeem presented themselves as a united front, blaming Mohite for team dysfunction and making false and unsubstantiated accusations about Mohite's many failures as a team member.

38. These five team members claimed, falsely, that Mohite did not submit assignments; that she had trouble understanding things that the other team members understood perfectly well; and that she acted in a condescending, negative, and impolite manner toward the other team members. When Mohite attempted to ask the teammates for more details and facts about their allegations, she was silenced by Coach Kohut, who instructed Mohite to respond to their feedback only with "I acknowledge" or "Thank you."

39. By contrast, Coach Kohut accepted any and all statements made by Mohite's teammates as truth, in spite of the fact that the teammates provided neither details nor evidence about their allegations. Though Coach Kohut allowed Mohite to voice her concerns about her experience with gender bias on the team, Kohut's notes about the meeting omitted all references to Mohite's experience of gender bias.

40. Following the Inter-Team Feedback Meeting, Coach Gilfillan cited Kohut's meeting notes to justify placing Mohite under Performance Expectations ("PE"), a six-week process during which Mohite's teammates would evaluate her suitability for remaining in the program. In this report, Gilfillan states that Mohite had failed to be "an effective and supportive team member" and that her consistent behavior had created an "unsafe environment and put undue amounts of stress and frustration on the team."

41. Gilfillan cited the team contract in justifying her call for Mohite to be placed under PE: "if any member of the team repeatedly fails to uphold and respect this agreement, we will contact our Team Coach to support the team, and the individual, in re-establishing the

- 11 -

expectations we have of each other." What Gilfillan fails to note is that Mohite had been the person to complain about her teammates. In fact, Gilfillan's reference to the team contract assumes that Mohite's teammates had initiated the complaint that led to the investigation of her team. Gilfillan's assumption perfectly illustrates Gilfillan's indifferent attitude toward Mohite's personal experience on the team.

42. Coach Kohut informed Mohite that, beginning October 9, 2019, Mohite would be placed under the PE process, which would take place over a six-week period during which Mohite's suitability to remain in the program would be judged by the same classmates whose disparate treatment she had complained about repeatedly.

43. Since the PE process relies primarily on feedback from the individual team members, Mohite refused to undergo the process. Mohite believed the PE process would result in an unfairly biased evaluation of her performance on the team

44. The program administrators further retaliated against Mohite for complaining about sex discrimination, blaming her for ostensibly making the other team members feel unsafe, stressed out, and unsupported, while overlooking Mohite's documented complaints about some of her teammates' actions, which made *her* feel unsafe, stressed out, and unsupported.

45. The Plaintiff suspects that her teammates treated her in a demeaning way in response to her articulate and confident demeanor; her insistence on professional standards for inter-team communication; and her willingness to ask clarifying questions. One example of Mohite's teammates' misreading Mohite's communication style as an illustration of her sub-par intelligence came during the Inter-Team Feedback Meeting, when Richardson complained that Mohite "should understand things the first time and should not ask to repeat."

46. Gilfillan's report blames Mohite for creating an "unsafe environment" and putting "undue amounts of stress and frustration" on her teammates. Since Gilfillan's conclusions about Mohite rely on some team members' falsified reports about Mohite's failure to perform adequately, it follows that Cornell's EMBA program takes student feedback very seriously. For example, coaches Kohut and Gilfillan interpreted Naeem's claim that he did "not feel safe" around Mohite as evidence of Mohite's performance on the team. They accepted Naeem's confession as truth in spite of his failure to explain what Mohite did to make him feel unsafe. Naeem's only evidence for feeling "unsafe" is his feeling of inadequacy resulting from Mohite's efforts to improve the team's project. There are other examples of the coaches' apparent willingness to accept any student statement as evidence (with the exception of Mohite's statements); for example, Gaber and Jeswani claimed that Mohite had

not turned in certain assignments. When asked to clarify, they said she had not turned in an assignment for Project 1. Even though Mohite quickly disproved this allegation by bringing up the electronic submission record, Gilfillan nonetheless referenced the false allegation in her report.

47. In this report, Gilfillan further undermines Mohite's character when she states that October 8, 2019 was the first time Mohite had complained about severe harassment from her teammates. In other words, Gilfillan's report suggests that Mohite made an issue of her teammates' mistreatment of her as an excuse to avoid undergoing the PE process that resulted from the Inter-Team Feedback Meeting. In fact, Mohite has documented her ongoing complaints about harassment, including conversations with Coach Kohut on August 15, August 22, September 4, and September 28; communications with Coach Kohut and Director Thalheimer on September 15, September 28, and October 8; and communications with Coach Gilfillan on October 5 and 9.

48. Though Mohite repeatedly asked the program administration to provide concrete reasons for placing her under PE, they have failed to do so. In fact, in an email to Mohite, Director Thalheimer assured her that the PE process is usually reserved for issues with academic performance. In an email Thalheimer sent to Mohite on September 18, 2019, he explained that the PE process is not related in any way to instances of "unprofessional or inappropriate communication from a teammate"; rather, Thalheimer explained, "The PE process is specifically used to address academic performance on the learning team given the team-based structure and team-based expectations of the EMBA Americas program." Since Mohite has met all the academic performance standards laid out in the Program Policies and Procedures (including receiving all A's in her courses), and since Cornell insists that interpersonal conflict is not covered by the PE process, it follows that Mohite was placed under PE as a form of retaliation for complaining about sex and gender harassment.

49. The PE process began on October 9, 2019; at that time, Coach Gilfillan presented Mohite with documentation about the process. The PE document makes no mention of any specific problem behaviors in which Mohite engaged; rather it lists a series of requirements for Mohite's future behavior should she wish to remain in the program (insinuating, but not directly stating, that Mohite had not previously displayed these behaviors).

50. The PE document seems to reference the false and unsubstantiated complaints made by Mohite's teammates; for example, it states that while under PE, Mohite would need to "respond to all team communication in a prompt and respectful manner," even though this is

something Mohite has never failed to do. By contrast, several of Mohite's teammates failed to communicate respectfully to Mohite, yet none of these individuals were placed under PE, again illustrating the program's disparate treatment of her.

51. On January 6, 2020, Mohite was given the opportunity to present her case in front of Cornell's Joint Academic Committee. The JAC ordered Mohite to withdraw from the EMBA program, in part because of her refusal to undergo the PE process.

52. In its demand that Mohite must withdraw from the program, the JAC argues that Mohite's "actions contributed substantially to the dysfunction of her team," and that she has been "unwilling or unable to take ownership" of her contributions to the team's problems. If Mohite is responsible in some way for team dysfunction, as the JAC letter claims, this directly resulted from the effects of pervasive and ongoing harassment on her mental health; her refusal to remain quiet and accept such treatment as the status quo; and her frustration about Cornell's seeming indifference to the facts.

53. Cornell University Policy 6.4 states that the "university will not tolerate gender-based harassment [and] sexual harassment." Moreover, the university's Title IX Coordinator has written that students "have the right to consult with an advisor of their choice" about sex and gender harassment.

54. When Mohite consulted with the team coaches, Director Thalheimer suggested she file a formal complaint. Later, when consulting with her Academic Advisor, Professor Mannix, in preparation for the JAC hearing, Mohite asked Mannix what she would have done in Mohite's situation. Mannix responded that she would have evaluated her end goal (getting an MBA) before deciding whether or not to speak up. In other words, Mannix would have considered whether or not speaking up was worth the risk of not being able to finish the program. Mannix thus indirectly implied that Mohite should not have raised concerns about harassment for fear that it might interfere with her ability to complete the MBA program.

55. When Mohite consulted with Coach Kohut about how to address problems on her team, Kohut's advice ignored the specific, gender-based nature of her teammates' behavior. Later, Kohut actively discouraged Mohite from providing details about the incidents of sex and gender harassment Mohite had experienced. Kohut also omitted Mohite's complaints from the notes she gave to Coach Gilfillan, notes that Gilfillan relied on as she drafted a letter detailing Mohite's responsibility for team dysfunction.

56. The JAC confirmed Gilfillan and Thalheimer's decision to require Mohite's withdrawal from the program. This decision both relies on false, unsubstantiated claims and disregards

Mohite's experience and perspective. Since Mohite's allegations have been ignored, disregarded, or used against her, she had hoped to bring a lawyer to the JAC hearing. When the university informed Mohite that the JAC would hear her case, its letter, dated December 6, stated, "As this is an academic hearing, not a legal one, you may not be represented or accompanied by a lawyer." Later, but not until 4 January, the JAC informed Mohite that she could bring a lawyer to the January 6th hearing. Given the late notice, Mohite was not able to bring her lawyer. This is another example of how Cornell has isolated Mohite in order to justify its disregard of her allegations, as well as blame her for her experience of harassment and her willingness to speak up about it.

57. In sum, administrators in Cornell's Executive MBA Americas Program applied the team contract to Mohite but not to other members of her team. These same administrators blamed Mohite for team dysfunction; banned her from the classroom; and subsequently mandated that she withdraw from the program, without providing any evidence of how she violated their policies.

58. The JAC blames Mohite for not being willing to "take ownership of [her] personal contribution to [her] team's problems." It seems that by asking Mohite to take ownership of being victimized by harassment and retaliation, the university is insinuating that Mohite is somehow responsible for the inappropriate and illegal behavior of others.

59. Moreover, just as the program administration has overlooked evidence supporting Mohite's claims, it has also overlooked evidence of Mohite's successful efforts to collaborate with Team San Jose. Such evidence was provided by Mohite's teammates at the Inter-Team Feedback Meeting.

60. Finally, the JAC justifies its support of Coach Gilfillan and Director Thalheimer's conclusions by claiming that Mohite did not share the severity of her experience with program administrators early on in the program. However, Mohite has provided ample evidence of her teammates' severe mistreatment of her. In fact, she complained so vociferously that Director Thalheimer suggested she file a complaint with the university's Title IX office. After Thalheimer made this suggestion, he refused to hear any further details related to Mohite's complaint.

61. Stress caused by the discrimination and retaliation caused Mohite to suffer flare-ups of a pre-existing auto-immune condition, causing increased medical costs, pain and discomfort.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## COUNT ONE: DISCRIMINATION ON THE BASIS OF SEX

62. Plaintiff hereby reincorporates and realleges paragraphs 1 through 61 hereinabove, as if fully set forth herein.

63. Cornell University, and the Cornell Executive MBA Americas program, each constitutes an "education program or activity receiving Federal financial assistance" subject to the requirements of Title IX of the Educational Amendments Act of 1972, including the prohibition against sex discrimination codified at 20 U.S.C. § 1681(a).

64. The Plaintiff, Trupti Mohite, was placed on a working team with six other, all-male students; five of these students engaged in sexual misconduct that created a hostile environment for the plaintiff.

65. Administrators in Cornell's EMBA Program were notified by Mohite of sex discrimination against her on numerous occasions, including the following

    a. Mohite complained about said discrimination to her Team Coach, Amy Kohut, in writing and by phone, on August 15, 2019; August 22, 2019; September 4, 2019; and September 28, 2019;

    b. Mohite complained to Coach Kohut, as well as Program Director Verne Thalheimer, about said discrimination on September 15, 2019; September 28, 2019; and October 8, 2019; and

    c. Mohite communicated about said discrimination with Team Coach Janet Gilfillan on October 5, 2019 and October 9, 2019.

66. The misconduct against Mohite was so persistent and pervasive that she was not able to continue participating fully or benefiting from participation in Cornell's EMBA program. Mohite's inability to perform effectively on the team, which resulted directly from sex discrimination, was used by program administrators as evidence for their demand that Mohite withdraw from the program.

67. The persistent and pervasive misconduct included exclusion based on gender, sexual jokes, and other demeaning language.

68. Mohite's fellow teammates subjected her to jokes of a sexual nature, as well as repeated, unwanted references to her status as a single woman.

69. Several of Mohite's teammates treated the male members of the team with respect and inclusion, while simultaneously undermining Mohite's style of participating and excluding her from participating in mandatory group projects. The acts of exclusion included:

a. One teammate, Chakraborty, repeatedly silenced Mohite when she attempted to contribute to group discussions; became increasingly dismissive and demeaning after Mohite questioned his behavior; and assigned Mohite an unusually small role on the team project when he served as Project Leader;

b. In response to Chakraborty's behavior, one teammate (Jeswani) recommended that Mohite remain quiet during group meetings unless she was asked to contribute by one of her fellow teammates; another (Gaber) responded to Mohite's questions about the team project with the command that she simply do what she was told to do;

c. Both Chakraborty and Gaber organized team meetings that specifically excluded Mohite, even though the terms of the team contract required her to participate;

d. With reference to one such meeting excluding Mohite, Chakraborty claimed, in front of the entire team, that he would not "cooperate with Trupti even if the fucking Dean tells me to;"

e. Several teammates deliberately misinterpreted Mohite's style of participation: they refused to accept her corrections of their math errors; pretended that her tendency to ask exploratory questions during group meetings illustrated her lack of intelligence; and—likely as retaliation for her complaints about harassment—claimed to team coaches that her suggested improvements to group projects had created an "unsafe environment" for them.

70. The same teammates who excluded Mohite used demeaning language in spoken and written conversations with her, including:

a. Chakraborty referred to Mohite's complaint about derogatory treatment from him as "ape-shit";

b. In a group text with all members of the team, Richardson objected to Mohite's request for clarity about meeting times by stating her request was "bullshit" and claiming she was "about to get [her] ass cursed out";

c. When Mohite complained that Richardson was not pulling his weight on the team, Richardson responded by asking, "why did I waste my fucking time helping you edit"; stating, "sometimes you just need to shut the hell up and listen"'; and referring to her behavior as "mello dramatic BS";

PLAINTIFF'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

d. Richardson later complained to the Team Coach that Mohite's emailed communications with him—which were in fact polite and respectful—were making him so anxious that Mohite was responsible for reactivating his PTSD. Richardson told the Team Coach (Kohut) that he was considering filing a restraining order against Mohite for exacerbating his condition.

71. The sex discrimination became so pervasive that Mohite was unable to participate fully in the Cornell Executive MBA Americas Program in which she was enrolled, due to the following discriminatory behaviors:

a. Mohite was deliberately excluded from certain meetings, when her presence and participation at such meetings was required by the program protocols;

b. Mohite was later blamed for her inadequate participation even though it was orchestrated by her teammates;

c. Mohite's efforts to participate were disrespected or dismissed by her teammates;

d. Sexual remarks and references to Mohite's status as a single woman during group meetings made Mohite uncomfortable and prevented her from participating fully in group projects;

e. Ongoing harassment by five of the team members increased as a result of Mohite's complaints about it;

f. Once Mohite's complaints to the program administrators resulted in an investigation into the team, Mohite was blamed for the team's dysfunction; banned from attending classes with the team; and forced to finish the semester as a "team of one."

72. As a result of Mohite's complaints about her teammates, Director Thalheimer banned her from attending on-campus lectures. Mohite was given sub-par accommodations (and in one case, no accommodations at all) for viewing the live, online lectures that are a requirement for all students in the program.

73. The Program Administrators—Coach Kohut, Coach Gilfillan, and Director Verne Thalheimer—exhibited deliberate indifference to Mohite's complaints about sex discrimination.

74. When Mohite first complained about discrimination to Coach Kohut, Kohut ignored the specifically discriminatory nature of Mohite's complaints. Kohut merely recommended that

Mohite use the DISC Personality Profile, as well as her emotional intelligence, to better relate to her teammates.

75. During the Inter-Team Feedback Meeting, Kohut requested feedback about the team dynamic from all team members. During this meeting, the five teammates who had been harassing Mohite presented as a united front, making false allegations about Mohite's academic performance and behavior as a team member. In spite of the fact that the team members failed to provide evidence of these allegations, Coach Kohut accepted their claims as truth.

76. Even though Kohut ostensibly called the Inter-Team Feedback Meeting as a result of Mohite's ongoing complaints about sex discrimination, Kohut failed to include any details about Mohite's experience in her notes.

77. During this meeting, Kohut refused to allow Mohite to question her teammates for specifics about their false allegations against her, and instructed Mohite to respond only with "I acknowledge" or "Thank you."

78. Following this meeting, Kohut actively discouraged Mohite from providing Kohut with a detailed account of the incidents of sex discrimination about which she had been complaining.

79. In her notes about the Inter-Team Feedback Meeting, Kohut's notes reproduced the unsubstantiated claims made by Mohite's teammates and represented them as truth. Kohut presented these notes to Coach Gilfillan, who then produced a report that blamed Mohite for failing to be an "effective and supportive team member"; for creating an "unsafe environment" for the team; and for putting "undue amounts of stress and frustration on the team."

80. Gilfillan's report undermines Mohite's experience of discrimination from her teammates. Instead, Gilfillan's report faults Mohite for Richardson's unsubstantiated claim that Mohite had discriminated against him based on his PTSD so severely that he was considering filing a restraining order against her.

81. All along, the program administrators refused to address Mohite's complaints about sex discrimination on the team, claiming this was an issue for the university's Title IX Office. However, in a clear instance of both disparate treatment and deliberate indifference, Gilfillan *did* address Richardson's disability discrimination complaint against Mohite, and used it as evidence to support placing Mohite under an evaluation process known as Performance Expectations (PE).

82. Gilfillan's deliberate indifference to Mohite's complaint is further exemplified by the conclusion she makes in her report about Mohite. Based only on Kohut's notes from the Inter-Team feedback meeting, and the false and unsubstantiated claims therein, Gilfillan concludes: "It was *abundantly clear*, based on the entirety of the meeting and the subsequent conversations, that *no bias or collusion* on the part of the team to alienate or undermine Trupti was taking place" [emphasis added].

83. The sex discrimination by some of Mohite's classmates, and the further discrimination and deliberate indifference of the program administrators, caused Mohite harm, including emotional injury (consisting of increased anxiety, humiliation, fear, depression, and feelings of hopelessness and lack of self-worth).

84. The sex discrimination also deprived Mohite of educational opportunities and career opportunities, causing harm to her future career prospects, damage to career, loss of future income, loss of the value of educational services provided by Defendant, and other economic damages directly caused or reasonably related to Defendant's misconduct.

85. The sex discrimination against Mohite caused her to be deprived unfairly of academic good standing and culminated in her removal and exclusion from the Cornell Executive MBA Americas Program as of January 31, 2020.

WHEREFORE, Mohite prays this honorable Court for relief as follows:

a. For injunctive relief in the form of an Order requiring Defendant to reinstate Mohite as a student in academic good standing of the Cornell Executive MBA Americas Program;

b. For injunctive relief in the form of an Order requiring Defendant to protect Mohite from further unlawful discrimination within the Cornell Executive MBA Americas Program, including allowing her to move into another student cohort (such as Team San Francisco or another Team other than Team San Jose), so that she is not required to continue working with the group of all-male students within which she has been subjected to discrimination based upon her sex;

c. For compensatory damages for emotional injury;

d. For compensatory damages for economic harm caused by the deprivation of educational opportunities and career opportunities, including damages for harm to future career prospects, damage to career, loss of future

income, loss of the value of educational services provided by Defendant, and other economic damages caused by Defendant's misconduct;

e. For compensatory damages for the worsening of Mohite's pre-existing auto-immune condition, triggered by the stress to which Mohite was subjected by the discrimination and Defendant's deliberate indifference; and

f. For such other and further relief as this honorable Court determines to be right and appropriate.

## COUNT TWO: RETALIATION FOR A COMPLAINT ABOUT SEX DISCRIMINATION

86. Plaintiff hereby reincorporates and realleges paragraphs 1 through 85 hereinabove, as if fully set forth herein.

87. Cornell University, and the Cornell Executive MBA Americas program, each constitutes an "education program or activity receiving Federal financial assistance" subject to the requirements of Title IX of the Educational Amendments Act of 1972, including the prohibition against sex discrimination codified at 20 U.S.C. § 1681(a).

88. Program administrators of Cornell's Executive MBA Americas program retaliated against Mohite for her complaint about sex discrimination.

89. As a result of Mohite's complaint, Kohut called an Inter-Team Feedback Meeting during which Mohite's teammates presented as a united front and made false and unsubstantiated claims about her academic performance, as well as her performance as a teammate.

90. Kohut accepted these false and unsubstantiated allegations at face value and presented them to her colleague, Coach Gilfillan, who decided to place Mohite under PE, a six-week process during which Mohite's teammates would observe her behavior and determine whether or not she was suitable for ongoing participation in the program.

91. In other words, in response to Mohite's complaints about sex discrimination, the program planned for her ongoing suitability for the program to be determined by the very men who had both discriminated against her and made false claims about her—likely as a means of deflecting attention from their own behavior.

92. When Mohite refused to undergo this unfair process, Director Thalheimer banned Mohite from attending her remaining classes on Cornell's San Jose campus, and demanded that she finish the semester as a "team of one." Mohite was forced to attend the remaining lectures in isolation, using sub-par equipment and in one case being forced to view the live, online

lecture from a coffee shop. Due to being forced to work as a team of one, Mohite was also required to do a much greater amount of work, because she was required to individually complete assignments that were intended to be completed by a group of six students working together. The increased workload caused Mohite enormous stress.

93. Coach Gilfillan then produced a report about Mohite, using Coach Kohut's notes from the Inter-Team Feedback Meeting. The report blamed Mohite for the team dysfunction and recommended that she withdraw from the program. Gilfillan's report also deemphasized Mohite's claims about sex discrimination and falsely claimed that Mohite had not revealed the severity of her harassment until October, only after she had been placed under PE.

94. Mohite was placed under PE without being given any specific evidence of the justification for placing her under this process, and even though she has received grades of A in all of her courses. In an email he wrote on September 18, 2019, Director Thalheimer assured Mohite that the PE process is not related in any way to instances of "unprofessional or inappropriate communication from a teammate," but rather, "The PE process is specifically used to address academic performance on the learning team given the team-based structure and team-based expectations of the EMBA Americas program." Since Mohite has exhibited only stellar academic performance, her placement under PE can only be retaliatory.

95. Mohite subsequently appealed the program administration's decision to remove her from the program in front of Cornell's Joint Academic Committee (JAC). Ultimately, the JAC agreed with the program administration, demanding that Mohite withdraw from the program. The JAC blamed Mohite for not being willing to "take ownership of [her] personal contribution to [her] team's problems."

96. The retaliation by Defendant has unreasonably deprived Mohite of educational opportunities and of the academic good standing to which she is otherwise entitled based on her consistently high level of economic performance.

97. The retaliation caused Mohite severe emotional harm, including increased anxiety, humiliation, fear, depression, and feelings of hopelessness and lack of self-worth.

98. The retaliation has harmed Mohite's future career prospects, causing her substantial economic losses based on reasonably foreseeable damage to career and loss of future income. The retaliation has also deprived Mohite of the value of educational services provided by Defendant.

99. The retaliation culminated in Mohite's removal and exclusion from the Cornell Executive MBA Americas Program as of January 31, 2020.

WHEREFORE, Mohite prays this honorable Court for relief as follows:

    a. For injunctive relief in the form of an Order requiring Defendant to reinstate Mohite as a student in academic good standing of the Cornell Executive MBA Americas Program;

    b. For injunctive relief in the form of an Order requiring Defendant to protect Mohite from further unlawful discrimination within the Cornell Executive MBA Americas Program, including allowing her to move into another student cohort (such as Team San Francisco or another Team other than Team San Jose), so that she is not required to continue working with the group of all-male students within which she has been subjected to discrimination based upon her sex;

    c. For compensatory damages for emotional injury;

    d. For compensatory damages for economic harm caused by the deprivation of educational opportunities and career opportunities, including damages for harm to future career prospects, damage to career, loss of future income, loss of the value of educational services provided by Defendant, and other economic damages caused by Defendant's misconduct;

    e. For compensatory damages for the worsening of Mohite's pre-existing auto-immune condition, triggered by the stress to which Mohite was subjected by Defendant's retaliation; and

    f. For such other and further relief as this honorable Court determines to be right and appropriate.

100.  Plaintiff requests trial by jury as to all issues so triable.


DATED: February 3, 2020


Stanley R. Apps
3707 Poinciana Drive, No. 81
Santa Clara, CA 95051
stan@appsatlaw.com
(310) 709-3966
*Attorney for Plaintiff Trupti Mohite*